# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49179

NORTH WEST NEIGHBORHOOD
ASSOCIATION, an Idaho unincorporated
nonprofit association & registered
neighborhood association of the City of Boise,

    Petitioner-Appellant,

v.

CITY OF BOISE, an Idaho municipal
corporation,

    Respondent,

and

TRILOGY DEVELOPMENT, INC.; VIPER
INVESTMENTS LLC; FASTWATER LLC;
and COREY BARTON,

    Intervenors-Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, November 2022 Term

Opinion Filed: September 7, 2023

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Darla Williamson, District Judge.

The decision of the district court is <u>affirmed in part</u> and <u>reversed in part</u>. The case is remanded with instructions to invalidate Boise City Council's actions and remand to the City for the adoption of a reasoned statement.

Ertz Johnson, LLP, Boise, for Appellant. Brian Ertz argued.

Office of Boise City Attorney, Boise, for Respondent City of Boise. James Smith argued.

Givens Pursley, LLP, Boise, for Intervenors-Respondents. Deborah E. Nelson argued.

---

BRODY, Justice

    This appeal involves a petition for judicial review. Appellant challenges the district court's decision upholding Boise City Council's approval of three interrelated land use applications. We

1

agree with Appellant that Boise City Council failed to provide a reasoned statement explaining its approval of the applications as required by section 67-6535(2) of the Local Land Use Planning Act. We remand this matter to the district court with instructions to set aside Boise City Council's actions and remand to the Council for the adoption of a reasoned statement.

## I.    FACTUAL BACKGROUND

The North West Neighborhood Association ("NWNA"), the Appellant, is a group of neighbors that reside in the northwest corner of Boise in an area some affectionately call "Old Hill Road." The neighborhood runs adjacent to the Boise foothills and was annexed into the City in 2014. The rural character and history of the neighborhood is important to many of its residents. The City of Boise recognizes the neighborhood as the "Northwest Planning Area" in "Blueprint Boise," the City's Comprehensive Plan.



In early 2018, Trilogy Development, Inc., Viper Investments LLC, Fastwater LLC, and Cory Barton (together, the Intervenor-Respondents, hereinafter "Applicants"), through their representative, submitted three interrelated land use applications to the City seeking approval of a multi-use development project called "Prominence" on about 38 acres of land in the area. The project as initially proposed consisted of 286 dwelling units (156 single-family homes and 130 multi-family units). The applications were for: (1) a rezone from R-1A to R-1C/DA to increase residential density from 2.1 homes per acre to 8 homes per acre; (2) a planned unit development (the "PUD") with a use exception to provide flexibility in lot sizes and setbacks; and (3) a

2

preliminary plat for a subdivision to provide a layout of the project and create and record legal divisions of land to facilitate future land sales.

A city planning team reviewed the applications and recommended to the Planning and Zoning Commission ("PZC") that they be approved with conditions. The planning team's recommendations included a statement that "[c]omments from public agencies confirm the project will not place an undue burden on the transportation system or other infrastructure in the neighborhood." NWNA, on the other hand, actively opposed the project. Shortly before PZC's public hearing, NWNA submitted a petition with approximately 2,500 signatures in opposition to the project, along with oral histories of the land and photos of the open space. Ultimately, PZC made the decision to deny the PUD and recommended to Boise City Council (the "Council" or "City Council") that it deny the rezone application and preliminary plat because, among other reasons, there was a lack of essential fire services needed to support the project. Without an approved zoning change and PUD, PZC also recommended denial of the preliminary plat since it failed to conform to existing zoning requirements.

The Applicants immediately appealed PZC's decisions to the City Council, arguing, among other things, that PZC failed to provide a reasoned statement supporting its decision as required by Idaho Code section 67-6535(2). About six weeks later, the Council held a public hearing that lasted well into the night because of public participation. At the hearing, the Boise fire chief explained that the fire departments in Boise, Meridian, and Eagle had a long-standing written "mutual aid agreement" that permits the departments to ask each other for help in times of emergency. With the advent of computer-assisted dispatch, the chief went on to explain that the fire departments agreed to dispatch the closest engine, closest truck, and closest battalion chief when a structure fire occurs. He explained that, in practice, they have what is called "automatic aid." He further explained that he thought the City could have a formal "automatic aid agreement" in place by the end of 2019. The chief also explained that there would likely be a fire station built in the northwest area by the end of 2025; while there was not one planned at the time of the hearing, the fire departments were talking, and the construction project was in the City's budget. After hearing from the fire chief, the Applicants, and concerned citizens, the Council voted to start deliberating on the applications at the Council's next meeting on July 23, 2019.

At the July 23 hearing, the Council again took up the applications and heard from the fire chief so that he could address some of the citizen concerns voiced during the prior public meeting.

3

Specifically, he was asked to address the status of certain agreements with the Eagle Fire Protection District. He explained that he expected a signed automatic aid agreement very soon:

> Chief Doan: Okay Thank you, mayor, Council members. Yeah, this is a whole bunch of things all combined into one. There is a mutual aid agreement. There's an automatic aid agreement. There's a joint powers agreement. And then there's a contract for service. And all of that kept getting mixed up in the testimony the other night. So, let me – let me try to clarify each one of them to be clear.

> First, I appreciate how much support public safety, not only you, but all the neighbors have been discussing. And I appreciate it as fire chief. But mutual aid agreement, let's start there. We do have a mutual aid agreement with all the county agencies. It's – it's quite old. We have been working under that mutual aid agreement for many, many years. So we do have a signed mutual aid agreement.

> Automatic aid agreement. There is no automatic aid agreement, that is correct. But we – we – through the mutual aid agreement, we automatically dispatch all of our units just like one agency. So in essence, even though there's not a signed automatic aid agreement, in practice, we do it anyway. So I'm willing and already working on it and I think we can have it done by the end of this month, maybe next month, have a signed automatic agreement with Eagle. It's not needed, but if that's what makes everybody feel comfortable, I will get it. And we've already – I've already called the chief from Eagle. We've already started the discussions. What we're going to do is, in writing, we're going to put down what we do. And that's simply it. So we will have a signed automatic aid agreement very, very soon.

The chief was also asked to address the assertion that the Old Hill Road area had experienced a decline in service since it was annexed into the city. The chief explained that there are two different levels of service – one set forth in Blueprint Boise and one internal standard used by the Boise Fire Department – and that neither standard was mandatory. He also explained that the Boise Fire Department meets its internal standard of 5 minutes and 30 seconds in the Northwest Planning Area with the assistance of the Eagle Fire Protection District and the North Ada County Fire and Rescue District:

> Correct. So first, there was a quite a few – a bit of misinformation that there was a mandated level of service, that there was state statute or – there is nothing in federal or state or city that mandates a service, that the authority having jurisdiction, us, get to decide the level of service. There's two service level standards. There's the planning of four minutes a mile and a half in the Blueprint Boise. And there is our Boise Fire Department standard of we respond to all emergencies in five minutes and 30 seconds 90 percent of the time. Two different things. Neither are mandated. The five-minute and 30 seconds is our chosen level of service and we meet that in this area currently. All of us together – I know I've worked with all of you – believe that we should increase the service in the northwest. And we're working towards that. And I've presented my plan to move the station to Gary Lane to provide that service.

4

So we adequately serve this community right now. We meet our five minutes and 30 seconds with the help of Eagle, with North Ada County, with Boise. That's good government of all of us working together. And we do provide that level of service. Can we provide better? Absolutely. And I think that's all of our wish. I hope I didn't overstate that.

After addressing the fire service issues, Mayor Bieter also commented that he thought there should be some discussion about the possibility of using the city's open space and clean water funds in the development area to address citizen concerns. Based on these discussions and the prior public hearing, Council President Pro Tem Clegg moved to defer decisions on the applications so that the Council could give the Applicants and NWNA "firm direction" on the project's design issues:

I would – I would move that – that we defer for as – whatever length we can [the applications] with very firm direction from the council on some items that the parties could try to resolve and bring back to us for a final decision.

Clegg clarified that she wanted the Applicants to work with NWNA to: (1) redesign open space and pathways; (2) develop a phasing plan in concert with city plans for improved fire service in the northwest; (3) examine the form and design of the view scape on Hill Road Parkway; and (4) redesign the corner of Bogart and Hill Road Parkway to introduce an apartment complex that consisted of more than just a single, large building. Council President McLean questioned the procedural appropriateness of this move and stated that she would rather deny the applications outright. There was some discussion about the length of the deferral, but the Council ultimately decided, after discussing an acceptable hearing date with the Applicants, that a deferral until its October 1 meeting was permitted under Boise City Code. The motion then passed 4-1.

After meeting with NWNA and the city planning team on August 21 and September 4, Applicants submitted modified plans for the project which: included more publicly accessible open spaces and pathways; eliminated proposed townhomes and replaced them with single-family detached homes; and redesigned the apartment complex with more open space and multiple, smaller apartment buildings. As modified, the applications proposed 226 dwelling units with 130 single-family units and 96 conceptual multi-family units. The overall density of the project was reduced from 7.4 dwelling units per acre to 5.9 dwelling units per acre.

At the October public hearing, the city planning team presented the modified project, stating in its report that it would not place a burden on public facilities in the vicinity:

Furthermore, the revised project is in compliance with the objective standards of Boise City Code. There is also policy guidance supporting both the

5

rezone and associated PUD and subdivision. *Finally, a[s] detailed by ACHD, Boise Fire, and public works, all the agencies demonstrate the requested use will not place a burden on the transportation system or other public facilities in the vicinity.*

(Emphasis added.) The lead planning team member also explained that Boise Fire had entered into an automatic aid agreement with the Eagle Fire Protection District:

> Mr. Letson: So, again, beyond mediation, there were discussions about two other items that we felt we needed to get some more information on. So fire service was the first one. And as you can tell in the planning team's memo, Boise Fire and Eagle Fire have successfully entered into an automatic aid agreement for emergency services in the area.
>
> This will ensure the proposed project, and a larger part of Northwest Boise will officially be within a four-minute response time from Eagle Fire Station 42, which is highlighted with the yellow star there in the upper left.
>
> So the four-minute standard is the preferred standard as identified in Blueprint Boise. As detailed in the memo from Boise Fire dated September 23, once the city is able to move or if the city ultimately decides to move Boise Fire Station No. 16, highlighted here with the yellow, north of State Street, along Gary Lane, that would improve fire service in the area even more and be from the Boise Fire.
>
> And I do have representatives from the fire departments to dive into those details if you would like a little bit more information on fire service at this point.

The Council again received extensive comments from NWNA and its members. Ultimately, the Council unanimously approved the rezone and preliminary plat and voted to reverse PZC's denial of the PUD. The written decision adopted by the Council expressly provided that phase III of the project which involves the construction of multi-family apartment buildings shall not commence until construction of Fire Station #16 is underway. The reasoned statement that was approved by the City Council consisted of one and one-half pages of text with seven additional pages of standard conditions. After the approval of the project, NWNA submitted a request for reconsideration, which the Council denied. NWNA then filed a timely petition for review with the district court.

## II.     STANDARD OF REVIEW

The Local Land Use Planning Act ("LLUPA") allows an affected person to seek judicial review of the approval or denial of a land use application, as provided for in the Idaho Administrative Procedure Act ("Idaho APA"). *917 Lusk, LLC v. City of Boise*, 158 Idaho 12, 14, 343 P.3d 41, 43 (2015); I.C. § 67-6521(1)(d). The actions of a governing board are afforded a strong presumption of validity. *Duncan v. State Bd. of Acct.*, 149 Idaho 1, 3, 232 P.3d 322, 324

(2010). A reviewing court does not substitute its judgment for that of a governing board. *Id.* Rather, under the Idaho APA, a land use decision *shall* be affirmed unless the reviewing court determines the governing board's findings, inferences, conclusions, or decisions, were:

   (a) in violation of constitutional or statutory provisions;

   (b) in excess of the statutory authority of the agency;

   (c) made upon unlawful procedure;

   (d) not supported by substantial evidence on the record as a whole; or

   (e) arbitrary, capricious, or an abuse of discretion.

I.C. § 67-5279(3) (emphasis added). Importantly, even if a land use decision is made in violation of section 67-5279(3), the governing board's decision must be affirmed unless substantial rights of the appellant have been prejudiced. I.C. § 67-5279(4).

When a district court acts in its appellate capacity under the Idaho APA, this Court "review[s] the district court's decision as a matter of procedure." *917 Lusk, LLC,* 158 Idaho at 14, 343 P.3d at 43.) (quoting *Williams v. Idaho State Bd. of Real Estate Appraisers*, 157 Idaho 496, 502, 337 P.3d 655, 661 (2014)). When reviewing the district court's decision, this Court conducts an independent review of the governing board's record. *Id.* (citing *Dry Creek Partners, LLC, v. Ada Cnty. Comm'rs, ex rel. State*, 148 Idaho 11, 16, 217 P.3d 1282, 1287 (2009)). When the district court has affirmed a land use decision, this Court will uphold the district court's decision provided the governing board's findings were supported by substantial and competent evidence; however, we freely review the district court's conclusions of law. *Id.*

### III.    ANALYSIS

**A. Boise City Council's written reason for decision failed to satisfy the requirements of the Local Land Use Planning Act.**

NWNA contends Boise City Council's approval of the applications should be invalidated under the Idaho APA because the written reason for decision failed to satisfy the requirements of section 67-6535(2) of LLUPA. NWNA contends the Council's reason for decision, particularly as it relates to fire and traffic issues, is insufficient under LLUPA because it does not provide a rationale for the approvals based on the relevant standards and factual findings. Citing a dissent in *Davisco Foods Intern., Inc. v. Gooding County*, 141 Idaho 784, 794, 118 P.3d 116, 126 (2005) (Jones, J., dissenting), NWNA also contends that the Council failed to explain why its decisions vary from those of the PZC. The district court rejected NWNA's arguments after summarizing the Council's reason for decision and concluding that a comprehensive plan does not operate as legally

7

controlling zoning law, but rather serves to guide and advise the governing authority. We agree with NWNA that the Council's written reason for decision fails to satisfy LLUPA. We remand this case to the district court with instructions to invalidate the Council's actions and remand the matter to Boise City Council for adoption of a reasoned statement that complies with LLUPA.

Section 67-6535 of LLUPA expressly provides that the approval of a land use application must be based upon standards and criteria which are set forth in the governing authority's comprehensive plan, zoning ordinance, or other appropriate regulations:

> The approval or denial of any application required or authorized pursuant to this chapter shall be based upon standards and criteria which shall be set forth in the comprehensive plan, zoning ordinance or other appropriate ordinance or regulation of the city or county.

I.C. § 67-6535(1). The purpose of this requirement is so that "permit applicants, interested residents, and decision makers alike may know the express standards that must be met in order to obtain a requested permit or approval." *Id.*

The Local Land Use Planning Act also requires a governing authority to issue a written "reasoned statement" which accompanies its decision to explain why the land use application was approved or denied:

> The approval or denial of any application required or authorized pursuant to this chapter shall be in writing and *accompanied by a reasoned statement that explains the criteria and standards considered relevant, states the relevant contested facts relied upon, and explains the rationale for the decision based on the applicable provisions of the comprehensive plan, relevant ordinance and statutory provisions, pertinent constitutional principles and factual information contained in the record.*

I.C. § 67-6535(2) (emphasis added). The failure to address compliance or noncompliance with express approval standards or relevant decision criteria is grounds for invalidating a governing authority's decision:

> Failure to identify the nature of compliance or noncompliance with express approval standards or failure to explain compliance or noncompliance with relevant decision criteria shall be grounds for invalidation of an approved permit or site-specific authorization, or denial of same, on appeal.

I.C. § 67-6535(2)(a).

This Court explained in *Jasso v. Camas County* that the reasoned statement requirement serves important functions, including facilitating judicial review:

> The requirement of meaningful administrative findings serves important functions, including "facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration,

8

helping parties plan their cases for rehearing and judicial review and keeping within their jurisdiction."

151 Idaho 790, 794, 264 P.3d 897, 901 (2011) (quoting *Idaho Underground Water Users Ass'n v. Idaho Power Co.,* 89 Idaho 147, 156, 404 P.2d 859, 863 (1965)).

In *Jasso*, a developer applied for a preliminary plat to construct a residential subdivision consisting of fifteen lots. 151 Idaho at 792, 264 P.3d at 899. Two neighboring landowners objected to the application, citing concerns over public use of a private easement, a planned cul-de-sac that violated a length limitation imposed by county ordinance, and a failure to address flood mitigation. *Id.* The Camas County Planning and Zoning Commission initially recommended that the Camas County Board of Commissioners deny the application. *Id.* at 793, 264 P.3d at 900. The Board deliberated and remanded the application to the Planning and Zoning Commission with instructions to the developer to modify the plat. *Id.* The developer did as he was instructed, and the Commission recommended the Board approve the application. *Id.*

The Camas County Board of Commissioners subsequently issued findings of fact and conclusions of law approving the preliminary plat on several conditions, including that the road over the private easement be built to county specifications and that it include a "hammerhead" terminus. *Id.* Critically, the Board's findings and conclusions did not address the applicability of the floodplain provisions. *Id*. at 797, 264 P.3d at 904.

The neighbors filed a petition for judicial review with the district court. *Id.* The district court ruled in their favor, holding that the planned road was a cul-de-sac and violated a length ordinance. *Id.* The district court also held that the findings of fact and conclusions of law were inadequate under the provisions of LLUPA discussed above and violated the neighbors' substantial right to due process. *Id.* This Court affirmed the district court's decision. *Id.*

In addressing the reasoned statement requirement, this Court explained that we have repeatedly held local governing authorities to the standard set forth in Idaho Code section 67-6535(2). *Jasso*, 151 Idaho at 794, 264 P.3d at 901. We walked through a number of those decisions, explaining when statements issued by governing authorities were deemed deficient:

> In *Crown Point Development, Inc. v. City of Sun Valley*, the purported findings of the city council were merely recitations of portions of the record, rather than determinations of the facts disputed by the parties. 144 Idaho 72, 77–78, 156 P.3d 573, 578–79 (2007). This Court found the "findings" to be inadequate. *Id.* In *Workman Family Partnership v. City of Twin Falls*, the city council's factual findings explained that a rezone application was denied because the rezone imposed "[t]oo great a change," would devalue nearby residential properties, and "would

9

violate the integrity of existing residential zoning districts." 104 Idaho 32, 37, 655 P.2d 926, 931 (1982). We held that "[t]he reasons listed for the denial of the application … are basically conclusions. Nothing ... reveals the underlying facts or policies that were considered by the Council. The reasons listed ... provide very little insight into the Council's decision." 104 Idaho at 38, 655 P.2d at 932. In *Cooper v. Board of County Commissioners of Ada County*, the Court held that a board of county commissioners' findings and conclusions, supplemented by a staff report that stated some of the shortcomings for which the application was denied, were inadequate where the board denied the application "because of items 1, 2, 3 and 4 and Agricultural Policies No. 4 and No. 5 and also because of the school district." 101 Idaho 407, 408–09, 614 P.2d 947, 948–49 (1980).

*Id*. At the end of the discussion, we provided a summary of what a reasoned decision must consist of:

These cases demonstrate that *the reasoned statement must plainly state the resolution of factual disputes, identify the evidence supporting that factual determination, and explain the basis for legal conclusions, including identification of the pertinent laws and/or regulations upon which the legal conclusions rest.*

*Id.* (emphasis added).

Ultimately, the Court concluded that the Camas County Board of Commissioners' reasoned statement contained only recitations of procedural history, not findings of fact. *Id.* at 795, 264 P.3d at 902. The conclusions of law contained no explanatory language, but, rather, were only broad conclusions. *Id.* The Court explained that while inferences could be made about the basis for the Board of Commissioners' decision, making those inferences was not the role of a reviewing court:

It may be inferred that the Board concluded that Fricke Creek Road is a stub street and not a cul-de-sac, that the Subdivision Ordinance does not limit the length of stub streets, that the proposed subdivision has access to a public road, and that the floodplain ordinances are inapplicable. *However, I.C. § 67–6535 requires more than conclusory statements from which a decision-maker's resolution of disputed facts and legal reasoning may be inferred. It is not the role of the reviewing court to scour the record for evidence which may support the decision-maker's implied findings and legal conclusions. To the contrary, the reviewing court's responsibility is not to evaluate the sufficiency of the evidence or the soundness of the legal principles upon which a decision may have rested; rather, the role of the reviewing court is to evaluate the process by which the decision was reached, considering whether substantial evidence supported the factual findings, and evaluate the soundness of the legal reasoning advanced in support of the decision.*

*Jasso*, 151 at 795–96, 264 P.3d at 902–03 (emphasis added) (footnote omitted).

In this case, there may, in fact, be an evidentiary and legal basis for the Council's decision to approve the land use applications. Having said that, the difficulty we face on appeal, much like the situation in *Jasso*, is that we cannot engage in meaningful judicial review because no findings

10

of fact have been presented to the Court and the Council's one and one-half page "reason for decision" is largely conclusory and does not identify decision criteria or address the fire safety or traffic issues raised by NWNA in any meaningful fashion. To put it simply, we cannot evaluate the process by which the Council reached its decision or the soundness of its legal reasoning because the reason for decision failed to satisfy the requirements of section 67-6535(2).

The administrative record provided on appeal consisted of nearly 4,000 pages with extensive documentary evidence and transcripts of multiple public hearings with presentations from city planning staff, Applicants, and NWNA, statements from neighbors, and testimony from city fire staff on multiple occasions. From the moment public input was accepted, NWNA raised serious issues related to the level of fire protection service and traffic impacts of the project. In its presentation to City Council, NWNA, citing statutory provisions, Boise City Code provisions, and the City's Comprehensive Plan, reasoned that the project should not be approved because the 4-minute fire response time set forth in Blueprint Boise could not be met. After hours of public hearing and deliberation, the Council adopted a cursory one and one-half page reason for decision and seven pages of standard conditions. The entirety of the Council's reasoned decision was as follows:

### Rezone

*As further detailed in the attached findings, the requested rezone meets the approval criteria of B.C.C. Section 11-03-04.03(C7). It is consistent with the Comprehensive Plan.* The subject property has two land use designations, with the parcels to the north of Hill Road Parkway being "Suburban" and those to the south being "Compact." The requested R-1C zone is allowed in both of these land use designations. Furthermore, there are several principles within the Comprehensive Plan that encourage new housing that complements the surrounding neighborhood and does not require the costly extension of infrastructure *(Principles NAC3.1(a) and CC1.1). Principle NAC3.2 supports* residential infill and redevelopment in areas identified as suitable for change within the "Areas of Stability and Change" map. This area of the Northwest Planning Area has been identified as anticipated for "Significant New Development/Redevelopment." The subject property is located adjacent to an arterial roadway (Hill Road Parkway) and two collector roadways (Duncan Lane and Bogart Lane), which are intended to carry larger volumes of vehicle trips. Rezoning the property to allow more density along these roadways is in the best interest of the public as it will accommodate additional residents that can take advantage of existing services and amenities in the area.

The development agreement included in the application will ensure

11

compatibility with the surrounding neighborhood as it includes specific design and layout requirements for various aspects of the development. These include a limit on the height, number of stories, and dwelling units associated with the future multi-family building.

**Planned Unit Development**

The decision of the Commission was made in error as it was not supported by substantial evidence. Specifically, deferring the project and requiring the applicant team and representatives of the neighborhood to develop design alternatives allowed for the establishment of conditions that ensure the project will comply with the approval criteria for conditional use permits as outlined in the Development Code (BCC 11-03-04.7(C7)) The mix of housing types are compatible to the surrounding neighborhood. The higher density portion of the development on the south side of Hill Road Parkway is surrounded by detached single-family homes on typical R-1C lots (i.e., 5,000 square feet to 7,000 square feet in size). The lower density portion of the development on the north side of Hill Road Parkway is surrounded by vacant land and single-family homes on large lots. With this layout, the applicant has attempted to transition from a more intense development pattern along Hill Road Parkway to the less intense development pattern of the area to the north, which consists of several large vacant lots and single-family homes on large parcels. Overall, the development effectively transitions in intensity from the area nearest the State Street corridor in the south to the low density and open space areas in the north near the Boise foothills. The project is consistent with several principles in *Blueprint Boise* that encourage a mix of new housing and pedestrian-oriented infill development that does not require the costly extension of infrastructure. All necessary utilities and infrastructure are readily available to the site. The subject property is a mix of "Suburban" and "Compact" designated land which both support the type of project proposed, which consists of a mix of attached and detached single-family homes, as well as multi-family housing. The density of the project will not exceed the limitations of the R-1C zoning requested and the site is large enough to accommodate the requested use, including parking, open space, landscaping, and amenities. *Comments from public agencies confirm the project will not place an undue burden on the transportation system or other infrastructure in the neighborhood.* Finally, the proposed development will not adversely impact other properties in the near vicinity. All required setbacks have been met or exceeded and screening provided in the form of landscaping and fencing. The design of the project incorporates a significant amount of landscaped open space and several amenities that will be a benefit to the surrounding neighborhood.

**Preliminary Plat**

The proposed preliminary plat conforms to the requirements of the proposed R-1C (Single Family Residential) zone. The new public streets proposed with the

development are supported by Principles CC2.1(a), CC2.1(b), GDPN.1(a)and NW-C1.3asthey [sic] offer improved connectivity to the broader neighborhood. With the recommended conditions of approval, the Preliminary Plat is in conformance with Blueprint Boise, the Development Code, and other guiding documents.

Starting with the rezone decision, there were no findings of fact attached to the document or anywhere else in the administrative record that we have been provided on appeal. Beyond the failure to provide findings of fact, the Council's citation to the criteria for rezone approval was in error. The correct citation is Boise City Code section 11-03-04.3.C(7)(c) which provided that a rezone application must meet the following criteria to be approved. It:

    i.      Is in compliance with the Comprehensive Plan.
    ii.     Is in the best interests of the public convenience and general welfare.
    iii.    Maintains and preserves compatibility of surrounding zoning and development.

NWNA's position from the outset has been the rezone application should be denied because the project does not comply with the 4-minute level of fire service set forth in the Comprehensive Plan and is not in the best interests of the public's general welfare. The City Council's reason for decision fails to address the fire service issue in any way and is in violation of the requirements of section 67-6535(2). The City Council must explain in a reasoned decision whether the project complies with the level of fire service set forth in the Comprehensive Plan and whether the project is in the best interests of the public's general welfare, and the City Council must also set forth the facts upon which it relies to make those determinations.

The PUD decision suffers from similar defects. The decision does not clearly identify the standard of review that guided the Council's decision. Although not cited, it appears the Council may have started its analysis with Boise City Code section 11.03.03.9.C(2)(a)(i)-(vi) which sets forth the grounds upon which the Council, sitting as a review body, may find error with a decision made by PZC. It states:

    i.      The Council may find error on the following grounds:
    ii.     The decision is in violation of constitutional, state, or city law. An example would be that the review body's decision would be a taking.
    iii.    The review body's decision exceeds its statutory authority.
    iv.    The decision is made upon unlawful procedure. An example would be if notice of a required public hearing was inadequate. In such cases, the matter may be remanded to correct the error.
    v.     The decision is arbitrary, capricious or an abuse of discretion in that it was made without rational basis, or in disregard of the facts and circumstances

13

presented. Where there is room for two opinions, action is not arbitrary and capricious when exercised honestly and upon due consideration.

vi. The decision is not supported by substantial evidence.

B.C.C. § 11-03-03.9.C(2)(a)(i)-(vi).

After determining the PZC's decision was not supported by substantial evidence, the Council, without any analysis, appears to have applied the decision criteria in Boise City Code section 11-03-04.7.C(7)(a)-(g) which governs PUD decisions made by *PZC* (not the City Council) and provides:

(a) The location is compatible to other uses in the general neighborhood;

(b) The proposed use will not place an undue burden on transportation and other public facilities in the vicinity;

(c) The site is large enough to accommodate the proposed use and all yards, pen spaces, pathways, walls, fences, parking, loading, landscaping, and such other features as are required by this Code;

(d) The proposed use, if it complies with all conditions imposed, will not adversely affect other property of the vicinity;

(e) The proposed use is in compliance with the Comprehensive Plan;

(f) A multi-family building (any building containing more than two residential units) is designed to comply with the Citywide Design Standards and Guidelines;

(g) A drive-up window in a C-5 District, if it complies with all conditions imposed, will not adversely affect pedestrian traffic or create an unsafe pedestrian environment and that the location and design of the drive-up window provides proper on-site vehicle stacking based on peak hours, and minimizes potential circulation issues or other negative impacts to pedestrians or traffic. Recommended conditions of approval submitted to a review body and made available to the public shall not be altered by city staff or any other party prior to the public hearing. The decision body may later or modify conditions of approval.

Nowhere in the decision does the Council address the level of fire service protection. The closest it comes is in the statement: "Comments from public agencies confirm the project will not place an undue burden on the transportation system or other infrastructure in the neighborhood." This statement is as conclusory as those made by the Camas County Board of Commissioners in *Jasso*, and there are no factual determinations to support it. In addition, the City now contends on appeal that fire service is not a "public facility" and therefore subsection (b) of the decision criteria does not require the City Council to consider the burden the project may place on fire service. The City's legal position seems to belie the requirement of Boise City Code section 11-03-03.4.A, which required the City Council to forward the applications to all political subdivisions providing services to the site, including the Boise Fire Department, for review and comment. However, the

14

bigger point here is that it is the City Council that must first determine whether fire service is a "public facility" as that term is used in the Boise City Code and provide a written explanation for its decision. It is only then that we can engage in meaningful judicial review:

> If there is to be any meaningful judicial scrutiny of the activities of an administrative agency—not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring the administrative agency to demonstrate that it has applied the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an ad hoc basis—we must require that its order clearly and precisely stated what it found to be the facts and fully explain why those facts lead it to the decision it makes. Brevity is not always a virtue.

*Jasso,* at 796, 264 P.3d at 903 (quoting *Workman Family P'ship. v. City of Twin Falls*, 104 Idaho 32, 37, 655 P.2d 926, 931 (1982)).

Like in *Jasso*, the Council's failure to provide a reasoned statement explaining its decision necessitates that the approvals of the applications be invalidated pursuant to Idaho Code section 67-6535(2)(a). The failure to provide a reasoned statement that enables this Court to engage in meaningful judicial review has deprived NWNA of its substantial right to due process. We therefore reverse the decision of the district court in part and remand this matter with instructions to invalidate Boise City Council's actions and remand for the adoption of a reasoned statement that complies with the requirements of section 67-6535(2) of LLUPA. On a final note, we decline to accept NWNA's invitation to apply the dissent's reasoning in *Davisco Foods Intern., Inc. v. Gooding County*, 141 Idaho 784, 794, 118 P.3d 116, 126 (2005) (Jones, J., dissenting), to impose a requirement under LLUPA that the City Council explain on a point-by-point basis why its decision varies from PZC. Even if we were inclined to read such a requirement into LLUPA (we will leave that question for another day), PZC's reason for decision was as conclusory as the one issued by the City Council.

### B. The district court correctly held NWNA failed to preserve the Eagle Fire referral issue.

Before addressing NWNA's other procedural challenges to the PUD, we recognize that a governing authority's failure to provide a reasoned decision typically ends our review. In this case, it is necessary to address some additional issues raised by NWNA because those alleged procedural errors could affect the scope of the remand. To be clear, we are instructing the district court to remand this matter for adoption of a reasoned statement. The Council may, but is not required to, conduct further public hearings to receive testimony or other evidence.

15

Turning to the procedural challenge, NWNA contends that the City failed to comply with Idaho Code section 67-6511(2)(a) and follow its own requirement to refer the applications to the Eagle Fire Protection District ("Eagle Fire") for review and comment. LLUPA requires that "particular consideration" be given to "the effects of any proposed zone change upon the delivery of services by any political subdivision providing public services . . . within the planning jurisdiction." I.C. § 67-6511(2)(a). Correspondingly, the Boise Development Code provides that "[a]pplications requiring public hearings shall be referred to all political subdivisions providing services to the site . . . for review and comment." B.C.C. § 11-3-03.4.A. The district court held that NWNA waived its argument that the City of Boise violated these provisions, or, alternatively, that Eagle Fire is not the fire service provider for the proposed project. We agree with the district court that NWNA failed to preserve the Eagle Fire referral issue for judicial review. Thus, we affirm that portion of the district court's decision.

The district court set forth the legal standard for waiver early in its memorandum decision in its recitation of the standard of review. Citing *Balser v. Kootenai County Board of Commissioners*, 110 Idaho 37, 40, 714 P.2d 6, 9 (1986), the district court stated: "Judicial review is limited to those issues that were raised before the agency and issues asserted for the first time on judicial review will not be considered." Applying this standard to the Eagle Fire referral issue, the district court determined NWNA came "closer" to raising the issue when NWNA's vice-president testified at the July 16 public hearing that there was nothing in the record showing that Eagle Fire had been asked whether the project would place a burden on Eagle Fire's responsibility to cover its own district. The vice-president testified:

> Although this area relies on Eagle Fire District for coverage, Eagle Fire District has not signed a contract with Boise Fire. *There's nothing in the record that shows that Eagle Fire has been asked* whether covering Prominence would be feasible or whether it would place a burden on their primary responsibility to cover their own district.

(Emphasis added.) The district court reasoned this statement only came "closer" to raising the referral issue because it did not put the City Council on notice of a procedural violation: "While this comes closer to showing that the issue was raised than many of NWNA's citations to the record, *this still does not show that NWNA was raising the issue to the city council in the context that it had violated its procedures in not doing this*." We agree with the district court's legal conclusion.

16

This Court recently had occasion to examine issue preservation requirements in *Ada County Highway District v. Brooke View, Inc.*, 162 Idaho 138, 395 P.3d 357 (2017), and made it clear that to preserve an issue for appeal the party must raise the issue and take a position. In *Brooke View*, the Ada County Highway District (ACHD) took property from along the front of a gated retirement community to install a drainage ditch and sidewalks for students walking to school. *Id.* at 140, 395 P.3d at 359. Litigation ensued over the value of the taking, but it soon focused on damage ACHD caused to a large brick wall adjacent to the construction project. *Id.* at 141, 395 P.3d at 360. Brooke View sought to recover damages as part of the value of the taking. *Id.* ACHD consistently defended against the claim, taking the position "that damages caused during construction were not recoverable as part of just compensation." *Id*. at 142 n.2, 395 P.3d at 361 n.2. The district court rejected ACHD's position and held that damages were part of the taking claim. *Id*. at 141, 395 P.3d at 360.

On appeal, ACHD maintained its position that the valuation of just compensation did not include damage done during construction, but cited for the first time a statute that defined the valuation of just compensation, Idaho Code section 7-711, and the statute that provided that the actual value of the property at the date of the issuance of the summons is used to determined compensation and damages, Idaho Code section 7-712. *Id.* at 142 n.2, 395 at 361 n.2. Brooke View argued that ACHD's statutory support for its position was new on appeal and was therefore not properly preserved. *Id.* This Court held that ACHD properly preserved the issue because only specific arguments had changed, not ACHD's issue or position on the issue:

> Here, early in the proceedings before the district court ACHD adopted the position that damages caused during construction were not recoverable as part of just compensation. ACHD argued this position repeatedly, despite being admonished numerous times by the district court to stop doing so. There is no question that ACHD clearly raised the relevant issue before the district court. ACHD's specific arguments in support of its position may have evolved since the trial, but the issues on appeal and ACHD's position with respect to them remain the same.

*Id.*

In this case, NWNA's vice president raised the referral issue when he testified that nothing in the record showed that Eagle Fire was "asked" about the effects of the project on the delivery of services. The record establishes that NWNA raised the referral issue, but never took the position that there was a procedural violation because the City failed to submit the applications to Eagle Fire for its review and comment. During the July public hearing, the vice-president gave a

17

PowerPoint presentation which he used to walk through various provisions of Idaho Code, Boise City Code, and the Comprehensive Plan and argued extensively how the project failed to meet those requirements. In contrast, he never argued the city was legally required to submit the applications to Eagle Fire or that the City had failed to comply with its own code provision. While preservation principles are not so exacting as to necessarily require an objector to cite to a particular code provision, under the facts of this case there was not sufficient context to put the City Council on notice that NWNA was claiming a procedural violation. As such, NWNA's argument on appeal was not sufficiently preserved, and we affirm that portion of the district court's decision.

### C. NWNA's other procedural challenges to the PUD are not grounds for reversal because any errors did not prejudice NWNA's substantial rights.

NWNA contends that the Council's handling of the PUD application was made upon unlawful procedure. Specifically, NWNA contends the Council was obligated to confine its review of the PUD to evidence presented to PZC and that it erred when it deferred its hearing of the PUD (along with the rezone and preliminary plat) to give the Applicants the opportunity to submit a revised application. We need not address the merits of these arguments because we agree with the Applicants that NWNA has not shown these alleged errors prejudiced NWNA's substantial rights.

The Idaho APA expressly provides that even if a land use decision is made in violation of section 67-5279(3), the governing board's decision must be affirmed unless "substantial rights" of the appellant have been prejudiced. I.C. § 67-5279(4). In this case, NWNA contends the Council's alleged errors result in prejudice to its members' use and enjoyment of their properties. We agree with Applicants that this assertion is nothing more than a generalized grievance associated with *any* development of the 38 acres and is not linked specifically to the proposed project and is certainly not linked to approval of the PUD application.

NWNA also contends there is prejudice to their members' right to safety because of the "very real risk of fire and escalating opportunities for ignition that come with rising densities in a neighborhood bordering the Wildland Urban Interface . . .." The increased density created by this project would result from the approval of the proposed rezone and is not unique to the approval of the PUD. While we would not go so far as to say the PUD has no effect on density, where NWNA has not pointed to any unique harm caused by the approval of the PUD there is no ground for reversal. Because NWNA has not established prejudice to a substantial right caused by the alleged procedural defects in the handling of the PUD application, there are no other grounds for reversing

18

the Council's decision.

**D. No Party is Entitled to Attorney Fees.**

The parties make competing requests for attorney fees pursuant to Idaho Code section 12-117 which authorizes an award to a prevailing party in an action between a person and a political subdivision if the court "finds that the non-prevailing party acted without a reasonable basis in fact or law." I.C. § 12-117(1). In a similar vein, the Applicants request attorney fees as a sanction under Idaho Appellate Rule 11.2 because, among other reasons, they contend NWNA raised issues on appeal that had been waived and NWNA misrepresented facts and made arguments not supported by law.

The City is not the prevailing party so it is not entitled to attorney fees. NWNA is the prevailing party, but the standard for evaluating whether a party acted without a "reasonable basis in fact or law" under this statute is substantially similar to the standard for evaluating whether a party pursued an action "frivolously, unreasonably, or without foundation" under section 12-121. *S Bar Ranch v. Elmore Cnty.*, 170 Idaho 282, 313, 510 P.3d 635, 666 (2022), as amended (June 14, 2022) (citations omitted). Like in *Nemeth v. Shoshone County*, we cannot conclude that the City acted without a foundation in fact or law in defending on appeal the judgment it won in the district court. *Nemeth v. Shoshone Cnty*., 165 Idaho 851, 861, 453 P.3d 844, 854 (2019) ("[W]e cannot find that the [respondent] acted without a foundation in fact or law in defending on appeal the judgment they won below."). As a result, we decline to award NWNA attorney fees on appeal.

As for the Applicants' request for attorney fees as a sanction, the claims that NWNA misrepresented facts or made legal arguments without support go too far. While it is true the parties have disparate interpretations of the record and divergent interpretations of the applicable laws, those differences are the stuff that appeals are made of and hardly warrant sanctions. As such, we decline to award attorney fees to any party. Costs on appeal are awarded to NWNA pursuant to Idaho Appellate Rule 41.

## IV. CONCLUSION

We reverse the decision of the district court in part and affirm in part. We remand the matter to the district court with instructions to invalidate the actions of Boise City Council and remand this matter for adoption of a reasoned statement. Costs on appeal are awarded to NWNA.

Chief Justice BEVAN, and Justices STEGNER, MOELLER and ZAHN, CONCUR.